IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KALONJI MCMILLIAN,                    )
                                      )
            Petitioner,               )
                                      )
      v.                              )          No. 08 C 5828
                                      )
UNITED STATES OF AMERICA,             )
                                      )
            Respondent.               )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Petitioner Kalonji McMillian has filed a  "Motion to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255 (Dkt. No. 1).  The

government has responded and, for the reasons set forth below, petitioner McMillian's motion is

denied.

BACKGROUND

On July 26, 2001, a federal grand jury charged Kalonji McMillian ("McMillian") and his

co-defendants, Raymond Cooper ("Cooper") and Sedgwick Johnson ("Johnson"), with one count

of conspiracy to possess with intent to distribute and to distribute cocaine and cocaine base, in

violation of 21 U.S.C. § 846, one count of possession with intent to distribute cocaine, in

violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute cocaine

base, in violation of 21 U.S.C. § 841(a)(1).  *United States v. Cooper*, 01 CR 543 (N.D. Ill.) (Dkt.

No. 17).  All three defendants pleaded not guilty and proceeded to trial before a jury.

The facts, as presented at trial, are as follows:

The government's case against the defendants stems from the June 5, 2001 arrest of an individual named Jason Rauner ("Rauner"), who was arrested when he attempted to sell approximately one kilogram of cocaine to a confidential source. While in custody, Rauner named Cooper as his supplier and agreed to cooperate with law enforcement officials by arranging to receive a future delivery of cocaine from Cooper.

From June 6, 2001, through June 8, 2001, law enforcement officials recorded numerous telephone calls between Rauner and Cooper, and voicemail messages left by Cooper on Rauner's phone, as Rauner and Cooper negotiated the specifics of the upcoming drug sale.[1] At trial, Rauner testified that he and Cooper arranged for Cooper to supply Rauner with one kilogram of powder cocaine and one kilogram of crack cocaine. Cooper told Rauner that McMillian, known as "TuTu," would be the individual responsible for cooking the cocaine into crack.

On June 8, 2001, at approximately 12:30 p.m., law enforcement officials observed McMillian arriving at Cooper's residence, retrieving a white plastic bag with black markings from the trunk of his car, and then walking with Cooper into Cooper's house. Although not recorded on video surveillance, McMillian left Cooper's house about one hour later; he did not have the white plastic bag with him at that time.

---

[1] The majority of the conversations between Cooper and Rauner were presented to the jury in the form of audiotapes. Rauner, who was a government witness at the trial, helped the government agents prepare transcripts of these recorded conversations, and the transcripts were used at trial as an aid in listening to the audio recordings. Additionally, certain portions of the audiotapes were interpreted by Rauner at trial, and Rauner also testified to the content of the conversations according to his independent recollection. For ease of explanation, the court will use the phrase "Cooper told Rauner" to indicate the trial evidence presented to the jury at the trial in this fashion.

Later that day, at approximately 2:15 p.m., Cooper met with Rauner in the parking lot of a Sleep Inn.[2]  Cooper invited Rauner to come to Cooper's residence to watch McMillian cook the cocaine, but Rauner declined.  Cooper also confirmed that Rauner wanted one kilogram of powder cocaine and one kilogram of crack cocaine, and he informed Rauner that, according to McMillian, the cooking process would take about an hour.  At approximately 6:18 p.m. on June 8, 2001, Cooper returned to the parking lot of the Sleep Inn[3] and delivered the drugs to Rauner. When Rauner asked how much he owed McMillian for cooking the cocaine into crack, Cooper told him the fee was $500.

Officer Todd Arthur of the Cook County Sheriff's Office ("Officer Arthur") testified that, after Rauner's meeting with Cooper on the evening of June 8, 2001, Officer Arthur retrieved a white plastic bag with black markings from the floor of the front passenger side of Rauner's vehicle containing a brick of suspected powder cocaine wrapped in clear cellophane, two clear ziplock bags containing suspected crack cocaine, and a third bag containing suspected crack cocaine.  The defendants each stipulated that the substances found in the white plastic carrying bag were, in fact, approximately one kilogram of powder cocaine and slightly more than one kilogram of cocaine base.  Government expert Mary Beth Thomas testified that McMillian's fingerprint was found on one of the ziplock bags containing cocaine base.

---

[2] Government agents made a video recording of this meeting.  Additionally, Rauner wore a hidden microphone to this meeting, through which government agents recorded Rauner's conversation with Cooper.  Both the video and audio recordings were played to the jury at the trial.

[3] Government agents also made a video recording of this meeting, and Rauner wore a hidden microphone to this meeting.  Both the video and audio recordings were played to the jury at the trial.

At the conclusion of the trial, the jury found each defendant guilty on all three counts charged in the indictment. (01 CR 543, Dkt. Nos. 82-84.) McMillian was sentenced on January 30, 2003. McMillian timely appealed and argued that insufficient evidence existed to support his conviction and that his sentence violated the Sixth Amendment pursuant to *United States v. Booker,* 543 U.S. 220 (2005). *See United States v. Johnson*, No. 03-1323 (7th Cir. May 4, 2005) ("7th Cir. May 4, 2005 Order"). The Seventh Circuit rejected McMillian's insufficiency of the evidence argument; however, it ordered a limited remand of the defendants' sentences pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). This court advised the Seventh Circuit that it would reimpose the same sentences, and on June 1, 2007, the Seventh Circuit affirmed the defendants' sentences. (01 CR 543, Dkt. No. 156); *United States v. Johnson*, 240 F. App'x 131 (7th Cir. 2007). McMillian filed a petition for certiorari with the Supreme Court of the United States, which was denied on October 9, 2007. On October 10, 2008, McMillian timely filed the pending § 2255 motion.

## LEGAL STANDARD

Under § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b).

Generally, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review under § 2255 in the absence of cause and prejudice. *Massaro v. United States*, 538 U.S. 500, 504 (2003). However, the ineffective assistance of appellate

counsel may constitute the "cause" for failure to raise a claim on direct appeal. *Stone v. Farley*, 86 F.3d 712, 716 (7th Cir. 1996). Furthermore, an ineffective assistance of trial counsel claim may be raised for the first time on collateral review. *Massaro*, 538 U.S. at 509.

ANALYSIS

McMillian argues in his § 2255 motion that his conviction should be vacated, or alternatively, that his sentence should be reduced. He states three reasons in support of his argument: (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, and (3) abuse of discretion by the trial judge. For the reasons stated below, the court finds that McMillian is not entitled to relief under § 2255, and his motion is therefore denied without a hearing.

I.      Ineffective Assistance of Trial Counsel

McMillian asserts that he received ineffective assistance of counsel at trial because his attorney failed to do the following: (1) object to the audiotapes used against him at trial on the grounds that they contained hearsay statements, (2) object to the use and admission of these same audiotapes and the use of their corresponding transcripts on the grounds that the tapes were inaudible and the transcripts inaccurate, (3) properly cross examine several witnesses, (4) object to statements made by the government's attorney during closing arguments, and (5) raise either a "timeline" or a "mere presence" defense. The court finds that McMillian did not receive ineffective assistance of counsel at trial in violation of the Sixth Amendment for the reasons stated below.

To succeed on a claim for ineffective assistance of counsel, the movant must show (1) deficient performance on the part of his attorney that fell below an objective standard of

reasonableness and (2) prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687

(1984). If the movant fails to establish either of the two prongs above, the court's analysis may

end without considering the other prong. *Id.* at 697. An attorney's performance will only be

considered deficient for purposes of an ineffective assistance of counsel analysis if it falls

"outside the wide range of professionally competent assistance." *Id.* at 690. Attorney

performance is evaluated from a highly deferential point of view, and there is a "strong

presumption" that attorney conduct was reasonable. *Id.* at 689. Care must be taken to avoid

evaluating counsel's performance with the benefit of hindsight, and to instead consider the

challenged conduct "from counsel's perspective at the time." *Id.* Attorneys are not obligated to

"pursue every conceivable avenue; they are entitled to be selective." *United States v. Davenport*,

986 F.2d 1047, 1049 (7th Cir. 1993).

    A petitioner alleging ineffective assistance of counsel must also demonstrate that his

attorney's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 693. To

establish prejudice, a petitioner "must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at

694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome" of the proceeding. *Id.* In determining whether specified errors prejudiced the defense,

the evaluating "court should presume . . . that the judge or jury acted according to the law." *Id.*

Thus, a jury is presumed to have followed any limiting instructions issued by the judge. *United*

*States v. Payne*, 741 F.2d 887, 891-92 (7th Cir. 1984).


    A.    Failure to object to audiotapes on the grounds that they contained hearsay
          statements

At McMillian's trial, the government played multiple audiotape recordings of conversations between one of McMillian's co-conspirators, Raymond Cooper, and a confidential informant, Jason Rauner. The tapes contained statements made by Cooper implicating McMillian as the "cook" of the crack cocaine that Rauner would be buying from Cooper. McMillian argues that his attorney should have objected to the tapes as inadmissible hearsay not falling within the rule for co-conspirator statements found in Federal Rule of Evidence 801(d)(2)(E).

Under Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement is not considered hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The existence of a conspiracy, the defendant's involvement in the conspiracy, and the fact that the statements were made in furtherance of the conspiracy are preliminary facts that must be found by the court by a preponderance of the evidence under Federal Rule of Evidence 104(a) prior to the statement's admission under the co-conspirator rule. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). When determining if the preliminary facts necessary to admit a statement under Rule 801(d)(2)(E) have been established, the court may consider the statement itself; however, it is "not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." Fed. R. Evid. 801(d)(2). McMillian contends that the government could not meet its burden under *Bourjaily* and that his attorney's failure to object to the admission of the audiotapes at his trial constituted ineffective assistance of counsel.

This court disagrees with McMillian that there is a reasonable probability that the outcome of his trial would have been different had his attorney raised this objection. The government introduced sufficient evidence at trial to establish, by a preponderance of the

evidence, the preliminary facts necessary to admit the contents of the tapes as co-conspirator statements under Rule 801(d)(2)(E). "Factors indicating a drug conspiracy include transactions that involve large quantities of drugs, prolonged cooperation between parties, standardized dealings, a level of mutual trust, and sales on credit." *United States v. Bustamante*, 493 F.3d 879, 884-85 (7th Cir. 2007). At McMillian's trial, Rauner testified to facts which, under *Bustamante*, are consistent with McMillian's involvement in a drug conspiracy, including the following: Rauner began purchasing crack from Cooper in 1998; McMillian cooked the crack that Cooper would sell him; and Rauner had watched McMillian cook cocaine into crack at Cooper's house in the past. (Trial. Tr. 275-77.) Furthermore, Rauner testified that McMillian was usually paid a fee of $500 for cooking crack for Cooper (*id* at 298), Rauner also bought cocaine directly from McMillian "on a needed basis" (*id.* at 300:1), and he had observed McMillian and Cooper using each other's connections to buy and sell drugs (*id.* at 305).

Rauner's testimony and the audiotapes in question, taken together, were sufficient under the Seventh Circuit's decision in *Bustamante* to establish the existence of a conspiracy, McMillian's participation in the conspiracy, and the fact that the statements at issue were made in furtherance of the conspiracy by a preponderance of the evidence. Consequently, McMillian suffered no prejudice from his attorney's failure to object to the admissibility of the audiotapes.

B.    Failure to object to audiotapes and transcripts on the grounds that the tapes were inaudible and the transcripts inaccurate

McMillian also contends that his trial attorney was ineffective for failing to object to the admission of the audiotapes on the grounds that significant portions were inaudible or incomprehensible. The Seventh Circuit has held that partially inaudible tape recordings " 'are

admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy.' " *United States v. Zambrana*, 864 F.2d 494, 498 (7th Cir. 1988) (quoting *United States v. Wilson*, 578 F.2d 67, 69 (5th Cir. 1978)). Generally, the partial inaudibility of an audio recording is relevant to its weight, rather than its admissibility. *United States v. Robinson*, 956 F.2d 1388, 1395 (7th Cir. 1992).

McMillian has not shown a reasonable probability that the audiotapes would have been excluded had his attorney objected to their admission on grounds of inaudibility, thus altering the outcome of his trial. During the trial, portions of the tapes are described several times as being unintelligible (Trial Tr. 375, 368-69, 383) or containing "interference type sounds" (*id.* at 375:24, 491). However, McMillian has pointed to nothing in the record indicating that such a significant portion of the tapes was inaudible that the recordings as a whole should have been considered untrustworthy. The comments by the lawyers and the court regarding inaudibility addressed only isolated portions of the tapes and do not reflect any substantial concerns about the tapes' overall reliability. Moreover, this court heard the audiotapes during McMillian's trial and has no independent recollection of any such defects. The court is therefore not persuaded that McMillian suffered any prejudice from his attorney's failure to object to the admission of the audiotapes at his trial.

McMillian additionally claims that the transcripts of the tapes were inaccurate due to the tapes' inaudibility, and that his trial attorney should have objected to their use. Even if McMillian's attorney had raised this objection, this court would still have allowed the use of the transcripts in McMillian's trial with the same instructions to the jury that the court gave on the transcripts limited use: "it's the tape, not the transcript that's the evidence. You should rely upon your recollection of what you hear on the tape and not what's reflected in the transcript

unless it's consistent with the tape to the best of your recollection." (Trial Tr. 349:22-350:1.) "[D]istrict courts have wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audiotape recordings." *United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004). Rauner, who was a participant in all of the taped conversations, testified that he aided in the preparation of the transcripts and that they were a fair and accurate transcription of the tape-recorded conversations. This testimony lays a sufficient foundation for the use or admission of the transcripts in a criminal trial. Any objection based on the inaudibility of the underlying tapes would have gone only to the weight of the transcripts. *See United States v. Woods*, 556 F.3d 616, 620-21 (7th Cir. 2009) (affirming the district court's decision to admit transcripts of tapes because defendant's co-defendant testified that he helped prepare the transcripts and could understand the words on the tapes).

McMillian further argues, however, that the jury's ability to "properly evaluat[e] the inaudibility of the tape recordings" was impaired by the "ineffective procedures" through which Rauner was questioned by the government's attorney during McMillian's trial. (Dkt. No. 16 ("Reply") at 17.) The government's attorney frequently read portions of the transcript aloud while questioning Rauner, who in turn, according to McMillian, "read verbatim from the transcript" during his testimony. (*Id.* at 15-16.) While the court agrees with McMillian that this is not the appropriate way to conduct the direct examination of a witness, the court is not convinced that this practice could have impaired the jurors' ability to evaluate the audibility of the tapes as they were played in court. The jury listened to the tapes while viewing the corresponding transcripts prior to the government examining Rauner regarding conversations on any particular tape. Because the jury had ample opportunity to assess the audibility of each tape before Rauner was questioned about its contents, the court is not persuaded that the jury's ability

10

to evaluate the audibility of the tapes was impaired by the manner in which Rauner was questioned.

McMillian further argues that the transcripts became more than an aid and were elevated to the status of "primary evidence" as a result of the inaudibility of the tapes and the manner in which the transcripts were used by Rauner and counsel for the government. (*Id.* at 18.) However, this court instructed the jury numerous times that "it's the tape, not the transcript that's the evidence. You should rely upon your recollection of what you hear on the tape and not what's reflected in the transcript unless it's consistent with the tape to the best of your recollection." (Trial Tr. 349:22-350:1; *see also* 7th Cir. May 4, 2005 Order 9 ("Throughout the trial . . . the district court repeatedly told the jury that the transcripts were merely aids, not evidence.").) The jury is presumed to have followed the law, including limiting instructions given by the judge. *See Payne*, 741 F.2d at 891-92. Because McMillian has provided this court with no evidence overcoming this presumption, he has failed to establish that the transcripts were actually elevated to the level of "primary evidence" in the jurors' minds, or that he suffered any prejudice due to the failure of his attorney to object to the manner in which the transcripts were used at his trial.

Finally, McMillian contends that the impact of the allegedly inaccurate transcripts could have been mitigated had his attorney hired a forensic expert to prepare an alternative transcript for the portions of the tapes that were in dispute. McMillian does not explain how an alternative transcript would differ from that introduced by the government at trial, arguing only that "the specific conversation between Cooper and Rauner, whereby it was allegedly stated that Cooper told Rauner that [McMillian] cooked the cocaine, is inaudible." (Reply 14.)

Due to the strength of the other evidence introduced against McMillian at the trial, it is unlikely that the submission of an alternative transcript identifying the portion of the conversation which McMillian complains is inaudible would have affected the outcome of the proceeding. For example, Cooper made statements in several different taped conversations played at trial that implicated McMillian in the drug scheme, including: Cooper wanted Rauner to come over to his house and watch McMillian cook the drugs (Trial Tr. 404); the drug cooking process would take approximately an hour according to McMillian (*id.* at 405); Rauner owed McMillian five hundred dollars for cooking the cocaine (*id.* at 450); and Cooper and McMillian's drug source was harassing McMillian because Rauner had not yet paid for the drugs (*id.* at 461). Furthermore, Rauner testified independent of any transcript or audiotape that Cooper told him McMillian would cook the cocaine (*id.* at 342-43), and the government introduced evidence of a fingerprint alleged to belong to McMillian that was found on a Ziploc bag containing cocaine (*id.* at 722, 903-4). Accordingly, this court is not persuaded there is a reasonable probability that the outcome of McMillian's trial would have been different had his attorney hired an expert to prepare alternative transcripts of the selected portions of the audiotapes played at his trial.

C.      Failure to effectively cross examine witnesses

McMillian further argues that his trial attorney failed to effectively use the cross examination process in a number of ways, including to elicit testimony regarding evidence not found against McMillian that is typically uncovered in drug investigations and that the white bag McMillian was seen twirling on video surveillance could not have contained cocaine, because

that would risk "[s]pilling it on the street, losing product and money, is simply ludicrous."  (§ 2255 Mot. 43.)

Trial attorneys are not required to pursue every conceivable line of questioning with a witness, and cross examination is a matter of trial strategy to which the court gives great deference.  *United States v. Hirschberg*, 988 F.2d 1509, 1513 (7th Cir. 1993).  McMillian has pointed to no evidence overcoming the strong presumption that his attorney's conduct during cross examination was reasonable.  McMillian's attorney elicited testimony favorable to McMillian during his cross examination of government witnesses, including the following: the government was never able to confirm that Cooper placed phone calls to a number registered to McMillian (Trial Tr. 765); the government does not know if McMillian ever placed phone calls to the confidential informant or any of the co-defendants (*id.* at 769-70); there was no cocaine found in the fingerprint identified as belonging to McMillian (*id.* at 921-22); McMillian was never observed engaging in narcotics activity (*id.* at 965); and that it would likely take longer to cook the relevant amount of cocaine into crack than the time frame in which the government alleged McMillian did so (*id.* at 1083).

The court finds that McMillian has not established that his attorney's cross examinations of witnesses fell "outside the wide range of professionally competent assistance," therefore, his attorney's performance was not deficient under *Strickland.*  466 U.S. at 690.

D.    Failure to object to the government's closing argument

McMillian additionally challenges his counsel's failure to object to specific government assertions made during closing arguments regarding phone calls placed by Cooper.  Despite the fact that the government was unable to identify the owner of the phone that Cooper placed calls

to, the government's attorney asserted that Cooper made several phone calls to McMillian and offered conjecture about the content of one of those phone calls. (*See* Trial Tr. 1341:5-6 ("[H]e's on the phone with Kalonji, telling him to go ahead, apparently").) McMillian contends that his attorney's failure to object to the government's comments led the jury to believe they were true. This court, however, is not persuaded that this omission by McMillian's attorney constituted ineffective assistance of counsel.

First, the statements made by the prosecution during closing argument were not so obviously improper that McMillian's attorney was deficient for failing to object to them. While a prosecutor may not discuss facts that were not admitted into evidence in closing argument, he "may argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995). The government introduced evidence at trial establishing that McMillian's nickname was TuTu and that a piece of paper with a phone number written next to the name "TuTu" was found in Cooper's truck when he was arrested. (Trial Tr. 276, 736.) Further evidence showed that thirteen calls, which were either answered or went to voicemail, were made to this number from Cooper's phone. (*Id.* at 746.) A reasonable inference may be drawn from these facts that the phone number listed belonged to McMillian, and that Cooper was calling McMillian at that number. Because the government attorney's comments were not clearly improper, the failure of McMillian's attorney to object to them did not constitute deficient performance.

Furthermore, McMillian has failed to show that this omission prejudiced his defense. The court instructed the jury twice that the arguments of counsel are not evidence, and that if an attorney said something which differed from the jury's recollection of the facts as established at trial, the jury should rely on their own recollection. (*Id.* at 1250-51, 1346.) This court presumes

14

that juries follow instructions, and McMillian has pointed to no evidence indicating that the jury in his trial did not do so.  *See, e.g., Pickett v. Sheridan Health Care Center*, No. 09-3028, 2010 WL 2541186, at *10 (7th Cir. June 25, 2010).

Because McMillian has failed to establish either of the *Strickland* prongs, his claim for ineffective assistance of counsel based on a failure to object to comments made by the government during closing arguments fails.

E.    Failure to raise possible defenses

McMillian finally submits that he received ineffective assistance of trial counsel based on his attorney's failure to raise what McMillian refers to as a "mere presence defense," and his failure to call two witnesses at his trial in support of a "timeline defense."  The court addresses each of these contentions in turn.

McMillian argues that he was convicted based solely on his "mere presence" at Cooper's house the day of the drug transaction between Cooper and Rauner.  He claims his attorney should have argued in his defense that mere presence among criminals is not enough to establish membership in a conspiracy.  However, as discussed in previous sections of this opinion, there was a substantial amount of evidence introduced against McMillian other than his presence at Cooper's house on the day of the transaction.  Given the extent of the evidence introduced against McMillian at trial, it is not reasonably probable that the jury's decision would have been different had his attorney argued that an individual's presence among criminals is not alone sufficient to prove membership in a conspiracy.  Consequently, McMillian has failed to establish that he suffered prejudice due to his attorney's failure to advance this argument.

McMillian further asserts that his attorney was ineffective because he failed to introduce evidence at the trial showing that McMillian could not have cooked the crack in the time period alleged by the government: between 2:12 p.m. and 6:25 p.m. Specifically, McMillian contends that his attorney should have utilized D.E.A. Special Agent Zopp's statement to the grand jury that Cooper told Rauner at 2:12 p.m. on June 8, 2001, that the crack was already cooked. (Dkt. No. 18 ("Appendix"), at 2.) However, Rauner testified at McMillian's trial that Cooper invited him to come watch McMillian cook the crack—implying that the drugs had not yet been cooked—during Rauner's meeting with Cooper at 2:12 p.m. on June 8. (Trial Tr. 404.) Defense counsel, McMillian argues, should have called Agent Zopp as a witness to illustrate the contradictions in the government's theory of the case.

McMillian has provided this court with no facts that overcome the strong presumption that his attorney's failure to call Agent Zopp as a witness was an objectively reasonable trial strategy. *See United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997) ("A lawyer's decision to call or not call a witness is a strategic decision generally not subject to review."). Moreover, it is not clear how testimony indicating that the crack had been cooked by 2:12 p.m. on June 8, 2001, would have supported a "timeline defense" as articulated by McMillian in his § 2255 Motion. Instead, McMillian would have had a longer period of time in which to cook the crack in Agent Zopp's version of events, and McMillian does not argue that it would have been impossible for him to have cooked the cocaine into crack before 2:12 p.m. on June 8, 2001. Consequently, McMillian has not established either deficient performance by his attorney or that McMillian suffered any prejudice because Agent Zopp did not testify at his trial.

McMillian further contends that in support of a "timeline defense" his attorney should have engaged an expert witness to testify to the various stages in the process of cooking cocaine

into crack, and how much time the process would take. (§ 2255 Mot. 71.) According to

McMillian, an expert witness could have testified that it would be impossible to convert the

amount of cocaine in question into crack during the approximate four-hour time frame alleged

by the government. Specifically, he claims that an expert would have testified that the entire

process would take 417 minutes, including the time necessary for preparation, drying, packing,

and delivery of the crack. (*Id.* at 71.)

McMillian has not provided this court with an affidavit from an expert, or any other form

of evidence, supporting his unattributed claim that the process would take 417 minutes and could

not have been done in the period of time alleged by the government. Because "evidence about

the testimony of a putative witness must generally be presented in the form of actual testimony

by the witness or on affidavit," and "self-serving speculation will not sustain an ineffective

assistance claim," *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991), McMillian has

failed to adequately state a claim of ineffective assistance of counsel based on his attorney's

failure to acquire an expert witness to testify in his defense.


II.     Ineffective Assistance of Appellate Counsel

To prevail on a claim for ineffective assistance of appellate counsel, McMillian must

show that (1) his appellate attorney "ignored 'significant and obvious' issues," and (2) the ignored

issues were " 'clearly stronger' than the arguments raised on appeal." *Suggs v. United States*, 513

F.3d 675, 678 (7th Cir. 2008) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)). An

appellate attorney is "not required to raise every nonfrivolous issue on appeal." *Brown v. Finnan*,

598 F.3d 416, 425 (7th Cir. 2010) (citing *Martin v. Evans*, 384 F.3d 848, 852 (7th Cir. 2004)).

McMillian must further establish that there is a reasonable probability that the result on appeal would have been different had it not been for the deficient performance of his attorney. *Id.*

McMillian believes that his appellate attorney should have challenged his sentence during the direct appeal by making a "*Kimbrough* argument." (§ 2255 Mot. 88-89.) In *Kimbrough*, the Supreme Court held that a judge may consider his or her own disagreement with the 100-to-1 sentencing ratio for crack and powder cocaine under the Sentencing Guidelines when determining the appropriate sentence for a defendant. *Kimbrough v. United States*, 552 U.S. 85, 91 (2007). *Kimbrough* abrogated prior Seventh Circuit case law stating that a judge's disagreement with the crack/powder cocaine sentencing disparity is not a factor that can be used in determining whether a guidelines sentence is reasonable. *See, e.g., United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006).

Because the *Kimbrough* decision was not rendered until after the Seventh Circuit affirmed McMillian's sentence and after the U.S. Supreme Court denied McMillian's petition for certiorari, the Seventh Circuit's decision in *Miller* was still controlling at the time of McMillian's direct appeal. In this context, a *Kimbrough* argument was not "clearly stronger" than the insufficiency of the evidence argument raised by McMillian's appellate attorney. *See Suggs*, 513 F.3d at 678 (quoting *Gray*, 800 F.2d at 646). Because "[t]he Sixth Amendment does not require counsel to forecast changes or advances in the law," McMillian has not established that his appellate attorney was deficient for failing to argue for a reduction of his sentence under *Kimbrough*. *United States v. Stewart*, 388 F.3d 1079, 1091 n.6 (7th Cir. 2004) (quoting *Valenzuela v. United States*, 261 F.3d 694, 700 (7th Cir. 2001)).

McMillian also believes that his appellate attorney should have argued, pursuant to *United States v. Edwards*, 397 F.3d 570 (7th Cir. 2005), that it was improper to sentence McMillian under the guidelines applicable to crack cocaine because the laboratory reports identified the substance at issue as "cocaine base," rather than crack. (§ 2255 Mot. 89.) However, *Edwards* was decided on February 11, 2005, almost one year after the Seventh Circuit heard oral arguments on McMillian's direct appeal. Moreover, McMillian's appellate counsel, Phillip Turner, filed a letter with the Seventh Circuit pursuant to Circuit Rule 28(e) approximately one month after *Edwards* was decided and over a month before the Seventh Circuit's May 4, 2005 order was issued.[4] Turner's letter argued that McMillian's sentence should be vacated pursuant to *Edwards* because "there was no expert testimony that the substance involved was crack as opposed to some other cocaine base." Because McMillian's appellate attorney, Turner, did, in fact, raise the *Edwards* issue during McMillian's direct appeal, McMillian has failed to state a claim for ineffective assistance of appellate counsel on this ground.

III.     Judicial Abuse of Discretion

McMillian finally claims that the trial court abused its discretion by allowing the use of the audiotapes, which McMillian alleges were inaudible, and their corresponding transcripts by the government at his trial. To the extent McMillian argues that the trial court abused its discretion by allowing the jury to review the transcripts during its deliberations, his argument has already been rejected by the Seventh Circuit in this case: Cooper's attorney pressed the same

---

[4] Courts may take judicial notice of items in the public record. *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). Turner's Mar. 4, 2005 letter was filed in case number 03-1323 on March 23, 2005.

argument on the direct appeal of Cooper's convictions, and the Seventh Circuit found that "allowing the jury to review the tape transcripts does not constitute reversible error" because their use "did not unduly prejudice Cooper." (7th Cir. May 4, 2005 Order 9.)

Moreover, "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro*, 538 U.S. at 504. The only basis McMillian offers for his failure to raise these arguments on his direct appeal is the ineffective assistance of his appellate counsel. However, this court finds that McMillian's appellate counsel was not constitutionally ineffective because McMillian has not established a reasonable probability that the result of his direct appeal would have been different had his attorney made the argument now advanced by McMillian. As previously discussed in Section I (B) of this opinion, Seventh Circuit precedent supports the admission of the audiotapes and transcripts used in this trial. *See Robinson*, 956 F.2d at 1395 (holding that the partial inaudibility is generally relevant to the weight rather than the admissibility of an audio recording); *and Woods*, 556 F.3d at 620-21 (finding that the transcript of an audiotape, which the defendant contended was inaudible, was properly admitted where a confidential informant who took part in the recorded conversation testified that he could understand the audio recording and helped prepare its transcript). Because McMillian has not established the ineffective assistance of his appellate attorney, he has not demonstrated any cause and prejudice for his failure to raise the issue of judicial abuse of discretion in his direct appeal. Consequently, he is procedurally barred from raising this claim in his § 2255 motion.

IV.     Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, this court denies the issuance of a certificate of appealability ("COA"). To be entitled to the issuance of a COA, the movant must have made a "substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). This standard requires the movant to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack,* 529 U.S. at 484. The arguments expressed in McMillian's § 2255 Motion are either contrary to Seventh Circuit precedent applicable at the time of his attorneys' challenged conduct, or they amount to challenges of his attorneys' trial and appellate strategy. Consequently, this court finds that its resolution of McMillian's constitutional claims is not debatable among reasonable jurists.


## CONCLUSION

For the reasons set forth above, petitioner Kalonji McMillian's "Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255 and the issuance of a Certificate of Appealability are denied.



ENTER:



_James F. Holderman_
JAMES F. HOLDERMAN

Chief Judge, United States District Court

Date:   September 1, 2010